UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-22881-CIV-KING/DUBÉ

CHARLES C. STROMAN,

      Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before this Court on the Motion for Summary Judgment filed by the Plaintiff

(D.E. #20) and the Motion for Summary Judgment filed by the Defendant (D.E. #21) pursuant to an

Order of Reference entered by the Honorable James Lawrence King, United States District Judge.

The issue before this Court is whether the record contains substantial evidence to support the denial

of benefits to the Plaintiff, Charles C. Stroman (hereinafter "Stroman" or "Plaintiff").

### I. FACTS

On August 16, 2004, the Plaintiff filed applications for disability insurance benefits and

supplemental security income, alleging a disability onset date of January 1, 2002. (R. 13, 131-134).[1]

The applications were denied initially and on reconsideration. (R. 29-31, 521). An initial hearing was

held on March 12, 2008. (R. 539-577). Following the hearing, the ALJ issued a decision denying the

request for benefits. (R. 10-22). A request for review filed with the Appeals Council was denied. (R.

6-8).

---

1 All references are to the record of the administrative proceeding filed as part of the Defendant's answer.

The Plaintiff, age 58 at the time of the hearing, testified that he completed the ninth grade before dropping out of school. (R. 548-549). As a result of having HIV, Stroman testified he suffers from diarrhea, fatigue and depression; and stays in his room to sleep or watch television. According to Stroman, he has diarrhea once or twice a week and it will last until the following day. The Plaintiff added that taking Pepto Bismol helps alleviate the problem. (R. 549). Stroman testified he takes the medicine in the morning and it will usually work by the evening. He further testified he only uses over the counter medication for relief.

According to Stroman, he weighed 187 pounds but normally weighs 150. He attributed the weight gain to his medications; and stated his doctor said his cholesterol is high and he needs to pay attention to what he eats. (R. 550). Stroman testified he was last hospitalized on February 27th because he had been coughing for two weeks and the cough got progressively worse. The Plaintiff stated he used his "pump" and took cough medication which would remedy the problem for about an hour before having an ambulance take him to the emergency room. (R. 551). He explained that he was told by doctors he had asthma, although at the time of the hearing he had not yet received the testing results.

The Plaintiff testified he always feels short of breath when he walks. (R. 552). The Plaintiff also testified he sees his primary care physician on a monthly basis and has his prostate checked every three months. (R. 553). According to Stroman, on his last visit to the doctor, he was told that his prostate levels were high and his doctor was considering giving him hormone shots if they didn't decrease. (R. 554). Stroman stated that he takes his medications every morning and they make him feel "sluggish and weak." He further stated he will then lay down for 4-5 hours in order to try and regain his strength. The Plaintiff stated he wakes up at 5:00 a.m., gets out of bed to wash his face and brush his teeth; goes back to bed at 7:00 a.m. and will stay there until 3 or 4:00 p.m.. (R. 554).

The Plaintiff stated when he gets up he will go outside to check the mail or simply go back to bed. According to the Plaintiff, he lives alone; has a friend go to the grocery store for him; and will take a bus to his appointments. Stroman testified he also has hepatitis, but in its current state the hepatitis is treatable. (R. 555). Additionally, has been taking vitamins and medications once a day since 2004. The Plaintiff further stated he hasn't had any gaps in taking his medications. The Plaintiff testified he has pain and numbness in his knee, leg and feet. Stroman explained that sometimes when he is walking to the mailbox he gets a sharp pain in his leg and knee, which will spread from his knee to his foot and toes and he begins getting a burning sensation. (R. 556).

Stroman stated that sometimes he is just sitting in bed and the pain will come. According to the Plaintiff, he has had a wrist problem since 1975 and part of the bone in his wrist needs to be removed. (R. 557). The Plaintiff testified when he stands, he quickly needs to sit because he is in a lot of pain. He added that 800-milligram of Motrin will work for 4-5 hours before the pain would ultimately come back. The Plaintiff estimated he has the aforementioned pain three or four times a week. (R. 558). The Plaintiff described his past work as follows:

> I was – did labor work, all kind of labor work. Construction, building scaffolds, pushing wheelbarrows, digging ditches, working in warehouses, stacking boxes, unloading trucks. See, what else? Doing parks and recreation, cleaning parks up.

(R. 559). The Plaintiff elaborated on the job description and explained he dumped garbage cans inside the park, and picked up papers and cans on the beach. The Plaintiff stated his job involved walking between 15-20 blocks. (R. 559).

Stroman said that he once held a CDL Class A license to drive a tractor-trailer. The Plaintiff testified he has several side effects as a result of taking his medications such as diarrhea and fatigue. (R. 560). The Plaintiff stated he has good days and bad days, and usually spends most of his bad days

in bed. (R. 561). His bad days occur 3 or 4 days a week. Stroman said he has trouble sleeping and will usually go to sleep around 9:00 p.m., wake up at about 1:00 a.m. then fall back asleep around 2:30 a.m.. The Plaintiff stated he doesn't like taking medication to help him sleep because of side effects and described his side effects as follows:

> Drowsiness, and on top of that medication, you know, I'm already feeling fatigue. And then when I take that, the sleeping pill makes me feel worse. You know, I can't do nothing. I can't function.

(R. 562).

According to the Plaintiff, he gets depressed which prevents him from concentrating throughout eight hours of a typical workday. (R. 562). Stroman testified he has problems with his short term memory and will forget things he is suppose to do. (R. 563). He added that he can no longer go for walks in the park, dance, and does not feel comfortable socializing with his neighbors. He explained that he's felt this way since he started taking his medications four years ago. The Plaintiff stated he gets anxiety attacks where he will feel "real nervous." Stroman explained that things out of the ordinary such as riding a bus or train trigger the attacks; and starts sweating and breathing heavy. Additionally, Stroman stated he has hallucinations where he will see something running across the floor out of the corner of his eye. (R. 564-565).

Stroman testified that he can walk about one block before he needs to stop and rest for 15-20 minutes. He also stated that he can stand for 10-15 minutes before his knee begins to hurt. Additionally, he can lift and carry about 6 pounds from one side of the room to the other. Stroman also testified he has difficulty bending because of problems with his knee. (R. 566). According to the Plaintiff, he has problems reaching because if he stands flat on his feet the pressure on his knees will cause him pain. (R. 567). The Plaintiff stated he can sometimes cook, but if he cannot he will receive

help from his friend. He also stated that when cooking he doesn't stand at the stove. The Plaintiff further stated he tries to sweep a 10 x 8 area every day, but sometimes cannot. (R. 568).

The Plaintiff testified he tries to spend time with his grandchildren but becomes depressed because he cannot read to them as he is illiterate; cannot help them with the computer; and can't play with them in the yard. (R. 568-569). The Plaintiff said he hasn't driven since 1989 because he moved multiple times and has a suspended license. (R. 569-570). Stroman testified he hasn't used drugs since 2004 and he currently attends NA meetings. (R. 570).

In addition to the Plaintiff's testimony, Willie Willis, the Plaintiff's neighbor testified at the hearing. Mr. Willis stated he has lived four apartments down from the Plaintiff for two years and sees Stroman 3-4 times a week. He added that each visit lasts between 3-4 hours. Mr. Willis testified he felt the Plaintiff's biggest problem is related to fatigue and the Plaintiff told him he feels drowsy because of his medications. (R. 571). Mr. Willis stated the Plaintiff is lying down most of the time they are together and that Stroman is capable of walking between 1 to 1 1/2 blocks. He added that the Plaintiff will then need to sit and rest for 15-20 minutes. Mr. Willis stated he helps the Plaintiff with cooking, washing and "things of that order." (R. 572).

According to Mr. Willis, he assists the Plaintiff between 2-3 times a week. (R. 572). Mr. Willis stated that recently he has gone to the store for the Plaintiff which is 3 blocks from their apartments. Mr. Willis testified that the Plaintiff has good days and bad days, and on the bad days the Plaintiff is fatigued and drowsy. (R. 573). He added that the Plaintiff gets depressed and he can tell based on Stroman's expressions. (R. 573-574). According to Mr. Willis, the Plaintiff tries to do things on his own such as going to the store, doing laundry or preparing a meal, but Mr. Willis tells the Plaintiff to rest and he will finish the chores for him. Mr. Willis also stated that the Plaintiff

isolates himself from other people. (R. 575).

In addition to the testimony presented at the hearing, medical records were submitted to the ALJ. A review of the medical records and the specific issues raised by the Plaintiff in his Motion for Summary Judgment shows that the resolution of the issues do not require this Court to specifically set out all the medical evidence in detail. Accordingly, this Court will discuss the legal issues involved and will incorporate the facts as appropriate within the arguments presented below.

On April 25, 2008, the ALJ issued a decision finding that the Plaintiff's impairments of chronic obstructive pulmonary disease (bronchitis), HIV, osteoarthritis (right knee), depression and status post prostate cancer were severe but did not meet or equal the severity in the listing of impairments. (R. 15). The ALJ also found that the Plaintiff's retained the residual functional capacity to perform a full range of medium work. (R. 17). Based on these findings, the ALJ concluded that the Plaintiff could perform his past relevant work as a Park Maintenance Laborer, and thus, was not disabled within the meaning of the Social Security regulations. (R. 22).

## II. LEGAL ANALYSIS

Judicial review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C. section 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Kelley v. Apfel, 185 F.3d 1211, 1213 (11th Cir. 1999); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence" is more than a scintilla, but less than a preponderance and is generally defined as such relevant evidence which a reasonable mind would accept as adequate to support a conclusion. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).

In determining whether substantial evidence exists, the court must scrutinize the record in its

entirety, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. Foote v. Chater, 67 F.3d 1553 (11th Cir. 1995); Lamb v. Bowen, 847 F.2d 698, 701 (11th Cir. 1988). The reviewing court must also be satisfied that the decision of the Commissioner correctly applied the appropriate legal standards. See, Bridges v. Bowen, 815 F.2d 622, 624 (11th Cir. 1987). The court may not reweigh evidence or substitute its judgment for that of the ALJ, and even if the evidence preponderates against the Commissioner's decision, the reviewing court must affirm if the decision is supported by substantial evidence. See, Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Baker v. Sullivan, 880 F.2d 319 (11th Cir. 1989).

The restrictive standard of review set out above applies only to findings of fact. No presumption of validity attaches to the conclusions of law found by the Commissioner, including the determination of the proper standard to be applied in reviewing claims. Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). The failure by the Commissioner to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal. Cornelius v. Sullivan, 936 F.2d 1143, 1145-1146 (11th Cir. 1991).

Social Security regulations establish a five-step sequential analysis to arrive at a final determination of disability. See, 20 C.F.R. section 404.1520; 20 C.F.R. section 416.920 (a)-(f).

The ALJ must first determine whether the claimant is presently employed. If so, a finding of non-disability is made, and the inquiry ends. 20 C.F.R. section 404.1520(b). In the second step, the ALJ must determine whether the claimant suffers from a severe impairment or combination of impairments. If such a finding is not made, then a finding of non-disability results, and the inquiry ends. 20 C.F.R. section 404.1520(c).

At step three, the ALJ compares the claimant's severe impairments to those in the listing of impairments. 20 C.F.R. section 404.1520(d), subpart P, appendix I.  Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that if such impairments are established, the regulations require a finding of disability without further inquiry into the claimant's ability to perform other work. See, Gibson v. Heckler, 762 F.2d 1516, 1518, n.1 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed, and benefits are awarded. 20 C.F.R. section 404.1520(d).

Step four involves a determination of whether the impairments prevent the claimant from performing his or her past relevant work.  If the claimant cannot perform his or her past relevant work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show, at step five, that there is other work available in the national economy which the claimant can perform. 20 C.F.R. section 404.1520(e)-(f).

The claimant bears the initial burden of proving that he is unable to perform previous work. See, Barnes v. Sullivan, 932 F.2d 1356, 1359 (11th Cir. 1991).  The inability to perform previous work relates to the type of work  performed, not to merely  a specific prior job. See, Jackson v. Bowen, 801 F.2d 1291, 1293 (11th Cir. 1986).

The Plaintiff's first point of contention is that the ALJ erred in failing to consider Listing 14.08.

The Eleventh Circuit reviewed listing impairments and stated as follows:

> The Listing of Impairments describes, for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity.  *See* 20 C.F.R. § 404.1525(a).  Part A of the Listing of Impairments contains medical criteria that apply to adults age 18 and over.  *See* 20 C.F.R. §

404.1525(b); *see also* 20 C.F.R. § 404, Subpt. P, App. 1. To "meet" a Listing, a claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listings and the duration requirement. *Id.* 20 C.F.R. § 404.1525(a)-(d). To "equal" a Listing, the medical findings must be 'at least equal in severity and duration to the listed findings.' *See* 20 C.F.R. § 404.1526(a). If a claimant has more than one impairment, and none meets or equals a listed impairment, the Commissioner reviews the impairments' symptoms, signs, and laboratory findings to determine whether the combination is medically equal to any listed impairment.

Wilson v. Barnhart, 284 F. 3d 1219 (11th Cir. 2002). Additionally, while the ALJ must consider whether a claimant meets a listing, the ALJ need not mechanically recite that a claimant does not meet a listing in his decision, as this fact may be implied from the record. Hutchinson v. Bowen, 787 F. 2d 1461, 1463 (11th Cir. 1986).

The Regulations state that a person with HIV can meet the listing requirements as follows: "[a]ny individual with HIV infection, including one with a diagnosis of acquired immune deficiency syndrome (AIDS), may be found disabled under 14.08 if his or her impairment meets the criteria in that listing or is medically equivalent to the criteria in that listing." 20 C.F.R. Part 404, Subpt. P, App. 1 § 14.00F.

20 C.F.R. Part 404, Subpt. P, App. 1 § 14.00D3 sets forth the requirements for the documentation of HIV as follows:

D. Human immunodeficiency virus (HIV) infection.

3. Documentation of HIV infection. The medical evidence must include documentation of HIV infection. Documentation may be by laboratory evidence or by other generally acceptable methods consistent with the prevailing state of medical knowledge and clinical practice.

a. Documentation of HIV infection by definitive diagnosis. A definitive diagnosis of HIV infection is documented by one or more of the following laboratory tests:

I. A serum specimen that contains HIV antibodies. HIV antibodies are usually detected by a screening test. The most commonly used screening test is the ELISA. Although this test is highly sensitive, it may yield false positive results. Therefore, positive results from an ELISA must be confirmed by a more definitive test (e.g., Western blot, immunofluorescence assay).

ii. A specimen that contains HIV antigen (e.g., serum specimen, lymphocyte culture, or cerebrospinal fluid (CSF) specimen).

iii. Other test(s) that are highly specific for detection of HIV (e.g., polymerase chain reaction (PCR)), or that are acceptable methods of detection consistent with the prevailing state of medical knowledge.

When laboratory testing for HIV infection has been performed, every reasonable effort must be made to obtain reports of the results of that testing.

Individuals who have HIV infection or other disorders of the immune system may undergo tests to determine T-helper lymphocyte (CD4) counts. The extent of immune depression correlates with the level or rate of decline of the CD4 count. In general, when the CD4 count is 200/mm 3 or less (14 percent or less), the susceptibility to opportunistic disease is considerably increased. However, a reduced CD4 count alone does not establish a definitive diagnosis of HIV infection, or document the severity or functional effects of HIV infection.

b. Other acceptable documentation of HIV infection.

HIV infection may also be documented without the definitive laboratory evidence described in paragraph a, provided that such documentation is consistent with the prevailing state of medical knowledge and clinical practice and is consistent with the other evidence. If no definitive laboratory evidence is available, HIV

10

infection may be documented by the medical history, clinical and laboratory findings, and diagnosis(es) indicated in the medical evidence. For example, a diagnosis of HIV infection will be accepted without definitive laboratory evidence if the individual has an opportunistic disease (e.g., toxoplasmosis of the brain, pneumocystis carinii pneumonia (PCP)) predictive of a defect in cell-mediated immunity, and there is no other known cause of diminished resistance to that disease (e.g., long-term steroid treatment, lymphoma). In such cases, every reasonable effort must be made to obtain full details of the history, medical findings, and results of testing.

In the instant matter, the record evidence is clear that the Plaintiff meets the requirements of 14.00D3 and was diagnosed with HIV. However, to meet the listing requirement, the Plaintiff must also demonstrate that one of the requirements of 14.08 were satisfied as well. The standard set forth to meet the listing requirement under 20 C.F.R. Part 404, Subpt. P, App. 1, § 14.08K is as follows:

> Repeated (as defined in 14.00I3) manifestations of HIV infection, including those listed in 14.08A-J, but without the requisite findings for those listings (for example, carcinoma of the cervix not meeting the criteria in 14.08E, diarrhea not meeting the criteria in 14.08I), or other manifestations (for example, oral hairy leukoplakia, myositis, pancreatitis, hepatitis, peripheral neuropathy, glucose intolerance, muscle weakness, cognitive or other mental limitation) resulting in significant, documented symptoms or signs (for example, severe fatigue, fever, malaise, involuntary weight loss, pain, night sweats, nausea, vomiting, headaches, or insomnia) and one of the following at the marked level:
>
> 1. Limitation of activities of daily living.
>
> 2. Limitation in maintaining social functioning.
>
> 3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

With regard to the Plaintiff's condition, the ALJ stated as follows:

> In terms of the claimant's alleged HIV symptoms, the objective medical evidence shows that there have not been any significant fluctuations in his CD4 count. The claimant testified that his CD4

11

count is at a good level and that he has taken his medications plus vitamins once a day since 2004. When he takes his medications he is doing well.

As for his chronic obstructive pulmonary disease (bronchitis), the claimant had a couple of flare-ups, particularly when he was living on the street at the Salvation Army and not taking his medications. With short course of treatment he improved (Exhibit 7F, pg. 2, 11F, pg. 13 and 13F, pg. 26). He continues to smoke and has been reportedly told to stop. His impairment cannot be too severe or limiting if he chooses not to quit. He testified that the last time he had pneumonia was in 2004. Hospital records from Jackson Memorial Hospital, dated February 27, 2008 revealed an emergency room visit. The chest x-rays revealed no focal infiltrate, bilateral interstital markings (chronic). He was treated Albuterol inhaler and antibiotics. Good air movement was noted with wheezing in bilateral lower lung fields. The claimant was described as feeling better and in no distress. His condition improved and he was discharged the same day in stable condition. (Exhibit 25F, pg. 3).

(R. 20-21). Additionally, a review of the medical record reveals that on examination, the Plaintiff's CD-4 cell count was consistently 200 and he had a viral load of around 51 (R. 330, 337). The record also shows that while the Plaintiff was taking his medications, his HIV was found to be stable. (R. 336, 426, 433).

Although the ALJ did not specifically mention the listing, the ALJ did review the entire record, and the fact the Plaintiff does not meet a listing may be implied from the record for the reasons noted above.

The Plaintiff's second point of contention is that the ALJ erred in improperly rejecting the opinion of the Plaintiff's treating physician.

The opinion of a treating physician is entitled to substantial weight unless good cause exists for not heeding the treating physician's diagnosis. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.

1997).  Good cause has been seen when the treating doctor's opinion was not bolstered by the evidence; the evidence supported a contrary finding or the opinion was conclusory or inconsistent with the physician's own medical records.  If the ALJ disregards the opinion of a treating physician, the ALJ must clearly articulate his reasons. See Phillips v. Barnhart, 357 F.3d 1232, 1240-1241 (11th Cir. 2004).                                                                   °

Additionally, this Court previously held that, a treating physician's opinion will be given controlling weight if it is well supported by medically acceptable clinical and diagnostic techniques and is consistent with other evidence in the record. Holley v. Charter, 931 F. Supp. 840, 849 (S.D. Fla. 1996).  Further, a treating doctor's opinion is entitled to more weight than a consulting doctor's opinion. Wilson v. Heckler, 734 F. 2d 513, 519 (11th Cir. 1984).

On February 7, 2008, Dr. Cheryl Holder, completed an AIDS/HIV Questionnaire RFC and Listings form. (R. 443-449).  In the questionnaire, Dr. Holder, did not list any clinical or objective findings and opined that the Plaintiff's prognosis was "good." (R. 443).  Additionally, she stated that the Plaintiff's activities of daily living such as doing household chores, grooming and hygiene, paying bills or taking public transportation were not limited by the HIV.  She also stated that the Plaintiff's ability to engage in social functioning on a sustained basis was not markedly limited by symptoms or patterns of exacerbations and remissions.  Dr. Holder stated that emotional factors did not contribute to the Plaintiff's symptoms and functional limitations. (R. 445).

Dr. Holder also opined the Plaintiff's pain or other symptoms are often times severe enough to interfere with attention and concentration, and the Plaintiff is limited in his ability to deal with work stress was "moderate."  The questionnaire noted that the Plaintiff could continuously sit for more than

two hours and stand for 30 minutes. It further stated that the Plaintiff could sit and stand/walk for

less than 2 hours in an 8-hour workday and sit for at least 6 hours in an 8-hour workday. (R. 446).

The doctor further opined the Plaintiff would require an unscheduled 1-hour break every 4 hours

during an 8-hour workday. Dr. Holder stated the Plaintiff could lift frequently less than 10 pounds,

occasionally up to 20 pounds, and never over 50 pounds. (R. 447). Dr. Holder opined the Plaintiff

would have significant limitations doing repetitive reaching, handling or fingering; would have "good

days" and "bad days" and would miss work more than three times a month as a result of his

impairments or treatment. (R. 448).

The ALJ rejected Dr. Holder's assessment and stated as follows:

> I am rejecting the assessment of treating physician Cheryl Holder,
> M.D. of North Dade Health Center (Exhibit 24F) dated February 7,
> 2008 suggesting disability as such a determination is reserved to the
> Commissioner. Her assessment is quite contradictory and contrary to
> the other objective medical evidence in the file. She essentially
> established limitations that would prevent the claimant from
> performing even the minimal requirements of light and sedentary work
> activity due to HIV, knee pain, left wrist pain, Hepatitis C and
> depression. Dr. Holder's treatment and progress notes do not support
> her assessment (Exhibit 22F). Furthermore, the claimant testified that
> he no longer suffers from acute symptoms and that he has been
> compliant with his medications since 2004.

(R. 21). As noted herein, an ALJ may reject the treating physician's opinion if good cause is shown.

In the instant matter, the evidence of record does contradict the opinion of Dr. Holder as noted by

the ALJ. The Plaintiff's HIV was consistently found to be stable and controlled by medications.

Additionally, Dr. Holder's own statements within the assessment seem to contradict themselves. In

certain areas Dr. Holder stated that the Plaintiff's prognosis was "good" and that activities of daily

living such as doing household chores, grooming and hygiene, paying bills or taking public

transportation, and the Plaintiff's ability to engage in social functioning on a sustained basis was not markedly limited by symptoms or patterns of exacerbations and remissions. Further, while Dr. Holder stated that hepatitis and depression also played a role in the Plaintiff's condition she stated that she could not assess whether the Plaintiff was disabled and that a psychiatric evaluation was required to determine the extent of the Plaintiff's ability to do work. (R. 450). Although not contested by the Plaintiff, the ALJ went through a thorough evaluation of the Plaintiff's alleged mental impairment. (R. 16). Accordingly, it is the opinion of this Court that the ALJ's decision to reject the opinion of Dr. Holder was supported by substantial evidence.

The Plaintiff next contends that the ALJ's RFC evaluation is not properly supported by either a treating or examining medical source.

The residual functional capacity is an assessment which is based upon all of the relevant evidence of a claimant's remaining ability to do work despite his impairments. Lewis v. Callahan, 125 F. 3d 1436, 1440 (11th Cir. 1997), citing, 20 C.F.R. § 404.1545(a). "The RFC assessment must first identify the individual's functional limitations or restrictions and assess ... her work-related abilities on a function by function basis.... Only after that may RFC be expressed in terms of exertional levels of work, sedentary, light, medium, heavy, and very heavy." Freeman v. Barnhart, 220 Fed. Appx. 957, 960 (11th Cir. 2007).

> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

SSR 96-8p (4). In the instant matter, the ALJ reviewed the medical evidence in the record in addition

to the Plaintiff's hearing testimony. The ALJ then reviewed the opinion evidence and as noted above properly rejected the opinion of the Plaintiff's treating physician. The ALJ also noted that the history of the Plaintiff's treatment demonstrates that the Plaintiff's impairments continued to improve with consistent treatment and compliance with medications. (R. 21). At the conclusion of said evaluation, the ALJ formulated the Plaintiff's RFC and determined that the Plaintiff could perform a full range of medium work.   As the ALJ properly evaluated the entire record prior to making said determination, this Court cannot find that error is present.

The Plaintiff next contends that the ALJ failed to consider the side effects caused by the Plaintiff's medications.

The claimant's testimony of pain or other subjective symptoms standing alone, are not conclusive evidence of disability. See, Macia v. Bowen, 829 F. 2d 1009, 1011 (11th Cir. 1987). If an ALJ rejects a claimant's testimony on credibility grounds, the ALJ must explicitly state as much and give adequate reasons for that determination. Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995). There is no requirement that the ALJ refer to every piece of evidence, but the credibility determination must not be "a broad rejection." Dyer, 395 F.3d at 1211. Failure to set out the reasons for the discrediting of subjective pain testimony mandates, as a matter of law, that the testimony be accepted as true. Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).

This Court finds that while the ALJ did not specifically mention the side effects when discrediting the Plaintiff's testimony, his credibility analysis did not act as a broad rejection. The Plaintiff testified that as a result of taking his medications, he suffers from diarrhea, fatigue and drowsiness. The Plaintiff testified that the diarrhea is helped by taking Pepto Bismol and there is no

evidence in the medical record which would support that the Plaintiff suffered from extreme fatigue. As the Defendant correctly points out, when the sole evidence of side effects is the Plaintiff's testimony, the evidence is insufficient to support a finding of disability. Holley v. Chater, 931 F. Supp 840, 850 (S.D. Fla. 1996). Therefore, the Court finds that the ALJ's failure to mention the Plaintiff's alleged side affects did not act as a broad rejection and the ALJ's opinion was supported by substantial evidence.

The Plaintiff's next point of contention is that the Grids dictate a finding of disabled. This argument is moot after the Court's prior findings. As the Court found that substantial evidence supported both the ALJ's RFC evaluation and determination that the Plaintiff could return to his past relevant work, this argument lacks merit and cannot succeed.

The Plaintiff further contends that the ALJ failed to fully develop the record. However, the Court would note that if at the hearing, the Plaintiff was not satisfied with the record evidence regarding his limitations, then he should have presented contrary evidence. The Plaintiff has not demonstrated the kind of gaps in evidence necessary to demonstrate prejudice. Graham v. Apfel, 129 F. 3d 1420, 1422 (11th Cir. 1997).

### III. CONCLUSION AND RECOMMENDATION

Based on the foregoing, the Court finds that the decision by the Commissioner is supported by substantial evidence and that the correct legal standards were applied. Accordingly, it is the recommendation of this Court that the Motion for Summary Judgment filed by the Plaintiff (D.E. #20) should be **DENIED** and the Motion for Summary Judgment filed by the Defendant (D.E. #21) should be **GRANTED**.

Pursuant to Local Magistrate Rule 4(b), the parties have ten (10) days from service of this Report and Recommendation within which to serve and file written objections, if any, with the Honorable James Lawrence King, United States District Judge.  Failure to file objections timely shall bar the parties from attacking on appeal the factual findings contained herein. <u>Loconte v. Dugger</u>, 847 F.2d 745 (11th Cir. 1988), <u>cert. denied</u>, 488 U.S. 958 (1988); <u>R.T.C. v. Hallmark Builders, Inc.</u>, 996 F.2d 1144, 1149 (11th Cir. 1993).

**DONE AND ORDERED** this _____ day of September, 2009.


ROBERT L. DUBÉ
UNITED STATES MAGISTRATE JUDGE